IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MAURICE BURTON,

           **Plaintiff**

    **v.**

PENNSYLVANIA STATE POLICE,
and KATHY JO WINTERBOTTOM,

           **Defendants**

**CASE NO. 1:11-CV-1968**

**JUDGE SYLVIA H. RAMBO**

# M E M O R A N D U M

Presently before the court is Defendants' joint motion for summary judgment (Doc. 38) challenging the adequacy of Plaintiff's claims against his former employer and a state police investigator for discrimination, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 ("PHRA"). Defendants also challenge Plaintiff's freedom of association claim, brought pursuant to 42 U.S.C. § 1983, against the state police investigator. Disposition of this case turns on Plaintiff's failure to acknowledge that his employer had a legitimate prerogative to curb his admitted continued excessive socialization in the workplace. For the reasons set forth below, Defendants' motion will be granted.

## I.  **Background**[1]

### A.  **Facts**

Plaintiff Maurice Burton ("Plaintiff") is an African-American male, formerly employed as a State Trooper with the Pennsylvania State Police ("PSP").[2] (Doc. 19, ¶ 9.)  Plaintiff entered the State Police Academy in 1993 when he was 28 years old, and was promoted to the rank of Corporal in 2004.  (Burton Dep. at pp, 9-11; Doc. 19, ¶¶ 14-15.)  In 2006, he transferred to PSP headquarters to join the Bureau of Research and Development, which is made up of two divisions: a Planning Division and a Programming Division.  (Burton Dep. at p. 12; Doc. 19, ¶ 16.)  At the time pertinent to the instant matter, Lieutenant Walter Margeson ("Lt. Margeson") was the Director of the Planning Division, and Lieutenant Carl Harrison Jr. ("Lt. Harrison") was the Director of the Programming Division.  (Burton Dep. at pp. 13-14.)  The Bureau Director, Major Richard Stein ("Major Stein"), supervised both Divisions.  (*Id*.)  In 2007, Plaintiff accepted the position of Supervisor of the Policies and Procedures Section of the Programming Division.  (*Id*. at pp. 13, 15-17.)  In this capacity, Plaintiff supervised approximately six subordinates, most of whom were enlisted members[3] of PSP.  (Burton Dep. at pp. 16-17.)

---

[1]  In considering the instant motion, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

[2]  PSP is a paramilitary organization and an agency of the Commonwealth of Pennsylvania. It employs in excess of fifteen employees.  (Doc. 19, ¶ 10.)

[3]  The term "member" refers to any non-civilian PSP employee with the rank of Trooper or higher.  (Doc. 44, p. 8.)

During the course of his employment at PSP headquarters, Plaintiff became acquainted with Pamela Yandrich ("Yandrich"), a Caucasian female who was employed as the E-Library Administrator at the headquarters. (Doc. 39, ¶ 14; Doc. 19, ¶ 17.) Plaintiff's job duties necessitated frequent interaction with Yandrich and, as a result, the two became friends and often socialized while in the office. (Doc. 19, ¶¶ 18-19.) At some point in 2007, several of Plaintiff's superiors noticed that Plaintiff and Yandrich "were spending an extraordinary amount of time together." (Doc. 44-15, p. 26.) In an interview conducted by Defendant Lieutenant Kathy Jo Winterbottom ("Lt. Winterbottom"), an investigator with the Internal Affairs Division at PSP, Major Stein explained,

> It started to be kinda a running joke. You have to keep a bucket of cold water handy just to separate the two 'cause it was out of control. . . . They have a friendship that they are letting affect the workplace . . . I had a lot of people come up to me and make comments about it.

(*Id*.) Initially, Major Stein and Lt. Harrison addressed the matter informally by asking Plaintiff and Yandrich to reduce the amount of time they spent together in the office. (*Id*. at p. 22.) According to Lt. Harrison, Plaintiff and Yandrich generally would comply for a couple of weeks before resuming the same behavior. (*Id*.)

In his deposition, Plaintiff recalled Lt. Harrison approaching him on numerous occasions in 2007 and 2008 concerning his frequent and lengthy conversations with Yandrich.[4] (Burton Dep. at p. 25.) Plaintiff characterized Lt. Harrison's comments as unfair because nearly all of his conversations with Yandrich were "work-related," yet they were constantly told to watch the amount of time they

---

[4] Plaintiff recalled being spoken to regarding his interactions with Yandrich "at least about six times" in 2007 (Burton Dep. at p. 25) and at least three or four more times in 2008 (*Id*. at p. 28).

spent together, while no one reprimanded the white members in the Bureau who "just talk[ed] constantly." (*Id*. at pp. 28-30.) In the fall of 2008, after being addressed once again for spending too much time talking to Yandrich, Plaintiff approached Lt. Harrison regarding the constant criticism. During the conversation, Plaintiff questioned the reason certain white employees, who Plaintiff concedes were supervised by Lt. Margeson rather than Lt. Harrison, were not being similarly reprimanded. (*Id*. at pp. 29-30.) Lt. Harrison responded: "I can control my Division. I don't control the other Division. [Does] somebody over there [in the Planning Division] screw around too much? . . . [T]hat's not my bailiwick." (Doc. 44-15, p. 23.)

During another conversation pertaining to Plaintiff's interactions with Yandrich, Lt. Harrison, who is also an African-American male, stated, "any time a black man talks to a white woman, there's an issue." (Burton Dep. at p. 29; Doc. 44-15, p. 23.) Plaintiff noted in his deposition that Lt. Harrison was PSP's Equal Employment Opportunity ("EEO") liaison for the Bureau (Burton Dep. at p. 29); however, he was unsure of the context of Lt. Harrison's comment, explaining, "I don't know if [Lt. Harrison]'s saying it's an issue [to him], but I don't know if it's just a society thing or he's saying that's a problem here [at PSP]. I don't know." (Doc. 44-15, p. 11.) In his deposition, Lt. Harrison clarified that he was giving Plaintiff advice on a personal level.[5] (*Id*. at p. 23; *see* Harrison Dep. at p. 26.)

---

[5] Lt. Harrison explained that he was talking to Plaintiff "not so much as Lieutenant Harrison to Corporal Burton, but as man-to-man. . . . This wasn't an official, 'Hey, Corporal, you gotta do this.' This was me just trying to give him some advice. . . . I am in an interracial relationship. So, I know a little about this." (Harrison Dep. at p. 26.)

Shortly after the conversation between Lt. Harrison and Plaintiff, Major Stein acknowledged Lt. Harrison's remark, but told Plaintiff, "That's not who I am, and that's not how I operate. . . . [W]e're here to put out a good product and do a good job and that's it."[6]  (*Id*.)  However, Major Stein added, "I'd hate to see you leave[] though you do good work."  (Burton Dep. at pp. 31-32.)  In relaying the conversation to Lt. Winterbottom, Plaintiff said he interpreted Major Stein's last remark as a threat, noting, "Why [else] would he say that?  It's not like I gave him an inclination I was leaving."[7]  (Doc. 44-15, p. 11.)

In fact, at the time the conversation occurred, Plaintiff was in the process of testing for the rank of Sergeant, a promotion which requires a candidate to achieve a certain score and rank on a written and oral exam.[8] At the oral portion of the exam in May 2008, Lt. Margeson, the Director of the Planning Division, was an assessor on one of Plaintiff's panels.  Plaintiff immediately objected to Lt. Margeson's inclusion based on his concern that Lt. Margeson held a negative bias toward him because of Plaintiff's interactions with Yandrich.[9]  (*Id*. at pp. 58-60.) Although the site administrator provided Plaintiff with several options,[10] Plaintiff

---

[6] During his deposition, Plaintiff conceded that Major Stein's comment indicated that he did not run the office like Lt. Harrison's comment would suggest.  (Burton Dep. at p. 32.)

[7] Major Stein denied making this comment.  (Doc. 44-15, p. 27.)

[8] This was Plaintiff's second attempt at the promotion as he had failed the test previously. (Burton Dep. at p. 57.)

[9] Burton explained that his concern arose from a previous encounter between Lt. Margeson and Yandrich wherein Lt. Margeson had spoken to Yandrich regarding the amount of time she and Plaintiff were spending together at the office.  (Burton Dep. at pp. 59-60.)

[10] The site administrator provided Plaintiff with a copy of a document entitled, "Testing Agreement Document When a Candidate Identifies a Potential Problem With an Assessor."  (Burton
(continued...)

elected to keep Lt. Margeson on the panel and have a consultant examine the scores. (*Id*. at Ex. 3.) Plaintiff concedes that Lt. Margeson did nothing that was out of line or that threw Plaintiff off track during the exam. (Burton Dep. at pp. 66-68.) Nevertheless, following the exam, Plaintiff contacted the Bureau Director to discuss his concerns and she offered to have Lt. Margeson's scores removed from the panel. (Burton Dep. at p. 72, Ex. 4; Stephens Dep. at p. 60.) Plaintiff declined, and again chose to have Lt. Margeson's score remain. (*Id*.)

Plaintiff's results were less than impressive. He received scores ranging between 3.86134 and 4.79720 out of nine possible points for his performance between both panels of the Oral Board. (Burton Dep. at Ex. 5, pp. 2-3.) After standardizing the scores and re-scaling, the highest overall test score out of all the candidates was a 67 and the lowest was a 33.11615. (Burton Dep. at Ex. 5, p. 4.) Plaintiff received an overall score 44.15257 and was ranked 244 out of 476 (Burton Dep. at pp. 75-76, Ex. 5, p. 4.); consequently, Plaintiff did not receive the promotion.[11]

_____

[10] (...continued)
Dep. at Ex. 3.) The Testing Agreement offers Sergeant candidates four options to choose from in order to resolve their potential problem with an assessor: 1) to go before the individual assessor with the understanding that the assessors receive specific instruction not to consider outside information or share prior information about the candidate with other assessors on the panel; 2) to have a consultant examine the candidate's scores given by the problem assessor and determine whether the scores are substantially different from those of the other two assessors and, if so, the scores will be deleted as if they never occurred and the final score will be the average of the two remaining assessors; 3) to remove the problem assessor from the room and have the candidate's score determined from the two remaining assessors; or 4) to reschedule the testing for another day at a different location. (Burton Dep. at Ex. 3; Kassman Dep. at pp. 19-20; Stephens Dep. at pp. 52-53.)

[11] In order to be promoted to Sergeant, a candidate must be ranked in the top 100 (Burton Dep. at p. 73)

Plaintiff remained in his position as Corporal Supervisor in the Programming Division and continued to engage in lengthy conversations, albeit mostly work related, with Yandrich. In response to the conversations, Lt. Harrison issued Plaintiff and Yandrich written reprimands after his multiple informal censures went unheeded. The Supervisor's Notation[12] issued to Plaintiff provided as follows:

> I have continued to take heat this past year over the amount of time that you and Mrs. Pamela J. Yandrich spend in each other's office. For the most part, I have defended your actions as you both continue to do good work.
>
> I decided that this week, I would simply observe and not say anything. On Tuesday, the 25th of November, I watched as you spent a total of three and a half hours with Pam in your office before she came out.
>
> On Wednesday, the 26th of November, she was in your office for a total of two hours and 20 minutes before I went to lunch. I also observed that you stood in her office for at least one and a half hours in the afternoon.
>
> The Bureau as a whole is under scrutiny, and I cannot logically justify the amount of time being spent in each other's office.
>
> I have asked the both of you to monitor the amount of time spent together. It is now getting to the point where it is affecting the things that I do. I cannot allow this to continue.
>
> I am not going to dictate the amount of time that you interact. However, you **must** be much more reasonable in the amount of time spent together.
>
> This is not open for discussion or debate. Simply watch what you are doing.

---

[12] A Supervisor's Notation is a progressive form of discipline used by PSP. (Burton Dep. at pp. 38-39.) It is placed in the member's personnel file for six months at which time it is removed from the file and disposed of so long as there have been no other issues pertaining to the notation. (*Id.*) It does not prevent the member from testing for a promotion. (*Id.*)

(Burton Dep. at Ex. 1.)  While Lt. Harrison insisted that he issued the Supervisor's Notation on his own accord, he acknowledged that Major Stein had some influence in the matter.  (Harrison Dep. at p. 12.)

In his deposition, Major Stein could not recall if he specifically approved the Supervisor's Notation, but testified that he "certainly would have approved it" given the circumstances.  (Stein Dep. at p. 13.)  As he explained: "What I tried to do . . . as I [have] done in the past, in other circumstances involving other individuals, was to try to handle something like that informally.  Not make a big deal out of it, just get conformance and we'll move on."  (*Id*. at p. 13.)  However, in this instance, he observed no change in Plaintiff and Yandrich's behavior:

> I started watching them; mainly only whenever I would go back for coffee or when I would go back to talk to one of the Lieutenants.  If I would go to talk to [Yandrich], it really seemed that 99% of the time I'd go in to talk to one of the two, [Plaintiff] was in [Yandrich's office.] It was clear to me that they did not reduce their frequency or duration at all.

(Doc. 44-15, p. 26.)

Several days after receiving the Supervisor's Notation, Plaintiff met with Lt. Harrison and again questioned why he and Yandrich were constantly being addressed for talking to one another while other people were not disciplined in any fashion.  (Doc. 44-15, p. 10.)  Plaintiff theorized the reason for this disparate treatment was a "race issue," and stated that he believed Major Stein was "using [Lt. Harrison] to wash his hands of that."  (*Id*.)  Plaintiff said it was clear he was being targeted since the white members were not being reprimanded for excessive socialization.  (*Id*.)  He also added that Major Stein was "walking around making" inappropriate sexual comments yet no one was disciplining him (Burton Dep. at p.

35), explaining that, on one occasion, Major Stein said, "I'm offended when a woman doesn't swallow" and made another comment about his "girl thinking he had a big penis." (Doc. 44-15, p. 13.) Lt. Harrison denied that Plaintiff reported Major Stein's comments to him. (Doc. 44-15, pp. 21-22.)

A few weeks later, Major Stein approached Corporal Jack Reese ("Cpl. Reese") at the Bureau's 2008 holiday party and asked if he would be interested in taking Plaintiff's supervisory position within the Programming Division. (Doc. 44, p. 15.) Cpl. Reese declined the offer and later told Plaintiff about the conversation. (*Id.*)

In late December 2008, Lt. Harrison asked Plaintiff to participate in the January 2009 Cadet Oral Boards in Philadelphia. (Burton Dep. at pp. 43-44.) Plaintiff suggested that Lt. Harrison should instead send Trooper Melissa Sanzick, who had been assigned to cover the January Farm Show, to the Oral Boards since she lived near Philadelphia and to send another individual to the Farm Show. (*Id.*) Lt. Harrison agreed with Plaintiff's suggestion and assigned Trooper Sanzick to the Oral Boards.[13] (*Id.* at p. 44.) However, to Plaintiff's surprise, Lt. Harrison chose Plaintiff to take Sanzick's place at the Farm Show. (*Id.*) Plaintiff challenged the assignment,

_____

[13] According to Major Stein, Lt. Harrison suggested they send Plaintiff to the Oral Boards because the other staff members were involved in another project. (Doc. 44-15, p. 16.) Major Stein agreed. (*Id.*) A couple of days later, Lt. Harrison returned to Major Stein's office and reported that Plaintiff did not want to go to the Oral Boards and recommended that they send Sanzick instead. (*Id.*) Major Stein recalled that Lt. Harrison was reluctant to make the switch because Plaintiff was continuing to defiantly spend an exorbitant amount of time with Yandrich, but Major Stein suggested they just make Plaintiff happy since it was easier to send Sanzick to the Oral Boards and Plaintiff to the Farm Show as neither one would have to travel for the assignments. (*Id.* at 18.) Major Stein noted that, earlier in his career, he had gone to the Farm Show as a Trooper, Corporal, and Lieutenant. (*Id.* at 19.)

arguing that he should be exempt as a Corporal Supervisor.[14] (*Id.* at pp. 44-45, 50.) In response to Plaintiff's opposition, Lt. Harrison informed Major Stein that Plaintiff resisted covering either assignment. (*Id.*) Because the special order pertaining to the Farm Show assignment was posted for Troopers and Corporals, and Plaintiff was a Corporal, Major Stein confirmed that assigning Plaintiff to that detail was appropriate, notwithstanding Plaintiff's supervisor title. (Stein Dep. at pp. 15-16.)

On January 8, 2009, Plaintiff authored a letter to Lt. Harrison in which he raised complaints regarding his treatment at the Bureau. (Burton Dep. at p. 48; Doc. 41-3, pp. 19-20.) Plaintiff wrote, in pertinent part, as follows:

> I didn't understand why you were sending a Supervisor to the Cadet Oral Boards when you told me in 2007 (after I volunteered for Cadet Oral Boards upon becoming Supervisor) that you didn't send your Supervisors out and that you needed them here. And, your practice since then . . . was to always comes to me and ask me who was next up for whatever detail that was going on at that time. You told me that my name was given to you to attend the Oral Boards. . . . When I asked who gave you my name you replied "the Major." . . . I then asked you if the Major was giving me a shot. You said, 'You didn't know.'[[15]] I then stated to you that I felt like it's either discrimination or retaliation or both. I thought it might be retaliation due to the inappropriate things I've heard going on around here and related as much to you in our conversation. And now, all of a sudden, the practice that you've had the last couple years has changed, and now I'm singled out specifically by Major Stein. I also think its discrimination due to you

---

[14] In recounting these events to Lt. Winterbottom, Lt. Harrison recollected that, when he told Plaintiff about his reassignment to the Farm Show detail, Plaintiff announced, "I'll go to the Oral Boards, but I will not go to the Farm Show." (Doc. 44-15, p. 25.) Lt. Harrison said Plaintiff's comment "sealed the deal;" he would not change the assignments again. (*Id.*) He recalled thinking, "I [will] lose all credibility as a Division Director if the inmates are running the asylum. So, now, come hell or high water, [he's] going to the Farm Show." (*Id.*)

[15] Lt. Harrison told Lt. Winterbottom that he may have said he did not know if Major Stein was giving Plaintiff "a shot," as Plaintiff alleged, in order "to deflect" Plaintiff's frustration away from him. (Doc. 44-15, p. 25.)

specifically saying that Major Stein singled me out and the fact the majority of this Bureau consists of white Caucasian males who I see standing around daily for lengthy periods of time (sometimes with their Supervisors) talking, and nothing ever being said or done about that. But, as soon as I start talking to Mrs. Yandrich, it's a problem. You also told me, a few months ago, that you made the following statement to Major Stein[,] 'As soon as a Black man talks to a White Wom[a]n, it's a problem.' This same statement was also repeated to me by Major Stein.

\* \* \*

It should also be noted that you, on numerous occasions, stated that I do good work and that you didn't have a problem with my work, as my most recent EPR (which was completed by you) reflects. I also feel as the EEO Liaison when things are brought to your attention you choose to do nothing about them. I've spoken to several Supervisors and in all the years they've been in this Bureau the practice has been that unless a Supervisor volunteered for an assignment, nonsupervisory members were selected to attend. And they too believe this to be a form of retaliation. . . . This, along with your practice of always inquiring who's up next for assignment and telling me you don't send your Supervisors out are reasons for me to be concerned. As of January 7, 2009, my detail has been switched to the Farm Show . . . I feel also as a Supervisor I should have preference as to what detail that I'm ordered to attend. These reasons are justification for obtaining counsel.[16]

(Doc. 41-3, pp. 19-20.) The following day, Lt. Harrison responded by letter, stating:

[I]t should be obvious to you that the manpower situation in the Bureau is different than it was several years ago. This is going to require that you do more work.

\* \* \*

---

[16] Regarding his January 8, 2009 letter, Lt. Winterbottom asked Plaintiff whether he thought PSP would investigate his complaints. He replied, "I thought that maybe they would look into it, but . . . I don't know what I was expecting as far as them doing a full-fledged investigation." (Doc. 44-15, p. 16.) He explained that, at the time, he thought, "I don't want the Department to do an EEOC investigation on my behalf. . . . I'm not gonna go to the Department when the Department's the problem or people in the Department are the problem." (*Id.*)

> The Farm Show Detail calls for Trooper/Corporal assignment. You are a Corporal; and can be assigned as needed. The needs of the Department come first, and you do not get a say in the matter if I, as the Division Director, make an assignment. The fact that I have asked for input in the past, does not mean that I need to or will in the future.
>
> You are not losing money or having to travel for this assignment. You have not been stripped of your rank. Yet you feel that you have been retaliated against. By your logic, any assignment given that you are not in agreement with would be retaliation.
>
> You conveniently omit details in your correspondence. While I have stated that there is no problem with you speaking with Mrs. Yandrich, I have also told you to watch the excessive amount of time spent together during the work day. Three and a half hours, without a break is excessive. I do not care who it is that is involved.

(Burton Dep. at Ex. 2.)

On January 9, 2009 – the same day that he received Lt. Harrison's response to his letter – Plaintiff reported Major Stein's inappropriate sexual comments and his recent treatment at the Bureau, including the issuance of the Supervisor's Notation, the ceaseless comments regarding his interactions with Yandrich, and his detail assignments to Captain Martin L. Henry III ("Captain Henry"), the Equal Employment Opportunity ("EEO") Director for PSP.[17] (Burton

---

[17] In a processing worksheet completed by Captain Henry relating to his conversation with Plaintiff regarding Plaintiff's allegations, Captain Henry provided the following synopsis of the meeting:

> On January 9, 2008, the complainant reported to the EEO Office and indicated that he wanted to make an EEO complaint regarding the way he was being treated at the Bureau. The Complainant related that he believed this treatment was racially motivated. During our meeting, the [C]omplainant related that the Subject [(Major Stein)] "runs around the office talking about how he doesn't like girl[s] that don't swallow." Additionally, the Complainant states that the Subject "talks about the size of his penis and how he is endowed." The Complainant related that these conversations

(continued...)

12

Dep. at pp. 81-83; Doc. 44-15, p. 33.) Despite his concerns, Plaintiff did not intend to file a formal complaint with PSP (Burton Dep. at p. 83; Doc. 44-15, p. 34; *but see* Doc. 44-15, p. 33), and instead went to Captain Henry for guidance (Doc. 44-15, p. 16). Notwithstanding Plaintiff's intent, PSP initiated an Internal Affairs Division Investigation, IAD Number 2009-0190 ("IAD 2009-0190"), due to the nature of his complaints and the seriousness of his allegations. (Doc. 44-15, p. 4; Doc. 44-15, p. 35.) Major Charlie Skurkis, the Bureau Director, assigned Defendant Lt. Winterbottom to conduct the investigation.

Lt. Winterbottom testified during her deposition that she interviewed Plaintiff concerning his allegations on March 12, 2009. (Winterbottom Dep. at p. 37.) During the interview, Plaintiff reported Major Stein's inappropriate sexual comments. (Doc. 44-15, p. 12.) In discussing Plaintiff's reaction to Major Stein's comments, Plaintiff stated that he was offended, but attributed the comments to Major Stein believing he was comfortable with Plaintiff and Yandrich. (*Id*.) Plaintiff also explained that he felt he was being treated differently than the white members within the Bureau, particularly with regard to Lt. Harrison's frequent remarks about the amount of time he spoke to Yandrich and the Supervisor's

---

(...continued)
frequently take place in a public forum with male and female personnel present. The [C]omplainant was advised to put all of his complaints on paper, which he failed to do. He was subsequently contacted by the EEO Office Director, regarding his complaint and has provided correspondence indicating that he does not wish to pursue his complaint nor does he wish to further discuss the inappropriate comments made by the Subject.

(Doc. 44-15, p. 33.) In an interview with Lt. Winterbottom, Plaintiff denied stating that Major Stein "runs around the office" making inappropriate comments and instead reported that it happened on only one occasion. (Doc. 44-15, p. 14.) He also denied telling Captain Henry that Major Stein frequently made sexual comments in group forums. (*Id*.)

Notation he received for the same.  (*Id*. at p. 10.)  Plaintiff acknowledged that the amount of time he spoke to Yandrich had been brought to his attention more than once.  (*Id*.)  Plaintiff described his relationship with Yandrich as coworkers and friends and said they did not communicate outside of work.  (*Id*.)  He also told Lt. Winterbottom about Lt. Harrison's telling him that "whenever a black man talks to a white woman, it's a problem," and addressed Major Stein's reaction to the comment. (*Id*. at 11.)  In addition, he expressed his concern about Lt. Harrison ceasing his prior practice of consulting him about detail assignments after Plaintiff reported Major Stein's inappropriate comments.  Plaintiff also took exception to his being assigned to the Oral Boards and Farm Show details as a supervisor.  (*Id*. at 12.)

Yandrich corroborated Plaintiff's allegations against Major Stein during an interview with Lt. Winterbottom on March 13, 2009.  (*See id.* at p. 21.) Yandrich added that she had heard Major Stein make sexual comments and jokes in front of other members, but she could not provide any specific details.  (*Id*. at p. 22.)

On March 17, 2009, Lt. Winterbottom interviewed Major Stein with regard to Plaintiff and Yandrich's allegations and Major Stein adamantly denied making any inappropriate comments regarding his views on sexual decorum or his anatomical features.  (*Id*. at pp. 23-28.)  Instead, Major Stein alleged that it was actually Plaintiff who made inappropriate comments at work.  (*Id*. at p. 29.)  Major Stein believed the allegations against him were fabricated by Plaintiff and Yandrich in retaliation for his addressing their conduct within the workplace.  (*Id*.)  He indicated that it was readily apparent that Plaintiff and Yandrich were engaged in a sexual relationship, that the relationship was impacting their work with regard to the amount of time they were spending together in the office, and they both became

incensed when he addressed their work-related issues.  (*Id.*)  He recounted a meeting that Yandrich requested with him following the issuance of the written reprimands wherein Yandrich was "livid" and told him "there will be hell to pay."  (*Id.* at p. 26.) Yandrich denied making the comment.  (*Id.* at 22.)

During the course of her investigation, Lt. Winterbottom interviewed all personnel assigned to the Bureau of Research and Development to ascertain if any of them had heard Major Stein make inappropriate sexual comments (Doc. 41-6, p. 3, 20), and each member reported that he or she had never heard Major Stein make any such comments (*see* Doc. 44-15, pp. 24, 94-95, 100; Doc. 41-6, p. 11).  However, several members corroborated Major Stein's allegation that Plaintiff made inappropriate comments of a sexual nature in the workplace, but explained that Plaintiff did so while they were joking around in the lunchroom.  (*See* Doc. 44-15, pp. 94-99.)

During a followup interview, Plaintiff denied that he ever made comments of a sexual nature while at work, but was aware that some members alleged that he had.  (*Id.* at 19.)  In responding to the allegations, Plaintiff initially explained that the other members may have inferred something inappropriate from a benign remark, but later admitted that he did, in fact, make inappropriate sexual comments in the lunchroom in response to similar comments made by other members .  (*Id.*)  On April 22, 2009, Lt. Winterbottom submitted her general investigative report to Lt. Col. Kurtz for review.  (Winterbottom Dep. at pp. 79-80.) Lt. Col. Kurtz determined that Plaintiff's allegations against Major Stein were

"unfounded" as to the disparate treatment claim and "sustained"[18] as to the inappropriate comments in the workplace claim. (Laufer Dep. at p. 10.) Lt. Col. Kurtz referred the report to the disciplinary office for a determination as to the appropriate disciplinary action for Major Stein's infraction. However, upon reviewing the report, the disciplinary officers questioned Plaintiff and Yandrich's credibility and relationship, and sought supplemental investigations into the same.[19] (Hacken Dep. at pp. 53-54.) Lt. Winterbottom conducted the supplemental investigations as requested and re-submitted her investigative report for review. (*Id.* at p. 54.)

Major John Laufer reviewed Lt. Winterbottom's report and concluded that Plaintiff and Yandrich were less than truthful about their relationship.[20] (Laufer Dep. at pp. 16-21.) Since Plaintiff's and Yandrich's credibility was in doubt and Major Stein's adjudication hinged on their accusations, Major Laufer amended the

---

[18] A finding of "sustained" means that the investigation revealed that the conduct alleged did occur. (Laufer Dep. at pp. 10-11.)

[19] Plaintiff takes issue with Captain Hacken's assessment in this regard as it is not clear what evidence he relied upon to conclude there may be a credibility problem. (Doc. 44-1, ¶ 101.) As the court is simply relaying his thoughts and reasoning behind initiating a supplemental investigation, the court does not find it necessary to delve into what particular evidence led Captain Hacken to believe there may be credibility issues.

[20] According to Major Laufer, the investigation revealed that Plaintiff and Yandich made numerous telephone calls to one another and took leave on many of the same dates thus providing circumstantial evidence that they had a personal relationship. (Laufer Dep. at pp. 21-33.) Major Laufer did not infer that the relationship was necessarily romantic. (*Id.* at p. 23.) Moreover, Plaintiff and Yandich originally denied that they made the phone calls, but telephone records proved otherwise. (*Id.* at p. 31.)

adjudication to "not-sustained"[21] and submitted the report to Lt. Col. Kurtz for final review. (Laufer Dep. at pp. 16-17, 22, Ex. 2.)

Upon reviewing the report, Lt. Col. Kurtz noted several potential infractions of PSP protocol by Plaintiff and consequently initiated an additional investigation into those infractions.[22] (Doc. 41-6, p. 2.) The investigation was marked as IAD Number 2009-0339 ("IAD 2009-0339") and relied heavily on findings from IAD 2009-0190. (*See id*. pp. 2-40.) As a result of the investigation, PSP concluded that Plaintiff: 1) discussed the inappropriate sexual comments attributed to Major Stein to two subordinates; 2) made an inappropriate sexual comment; and 3) was less than 100-percent truthful when questioned regarding how much of a confidential correspondence he had read before realizing he was not authorized.[23] (Burton Dep. at Ex. 6; Doc. 41-6, p. 2.) Captain Hacken imposed a

---

[21] An adjudication of "not-sustained" means it cannot be proved one way or another whether the alleged conduct actually occurred. (Laufer Dep. at p. 43.) Because Major Stein's adjudication was changed to "not-sustained," the investigation did not go back to the disciplinary office or to Captain Hacken. (Hacken Dep. at p. 54.)

[22] The first page of the summary report clearly sets forth the reasons for the investigation:

> [I]nformation brought to light in IAD Investigation 2009-0190, which detailed incidents where Corporal Maurice L. Burton was to have made inappropriate sexual comments in the workplace, repeated inappropriate sexual comments attributed to Major Richard A. Stein to other Department members, opened an official IAD confidential correspondence envelope addressed to another member, and was less than truthful regarding questioning relative to the confidential IAD correspondence.

(Doc. 41-6, p. 2.)

[23] In adjudicating Plaintiff, Major Laufer found that, while it was through no fault of his own that Plaintiff came to possess the confidential correspondence and accepting that he inadvertently opened it, Plaintiff was less than 100-percent truthful in answering questions posed by Lt. Winterbottom with regard to how much of the form he read before he realized he was not authorized. (Doc. 41-6, p. 3.)

five-day suspension upon Plaintiff for the infractions. (Hacken Dep. at pp. 31-32.) Captain Hacken testified that he viewed Plaintiff's inappropriate sexual comment as a minor infraction and accounted for the fact that other members frequently made similar comments in the lunchroom. (*Id*. at pp. 29-31.) He considered Plaintiff's untruthfulness during an investigation the more aggravating factor. (*Id*.) In assessing the appropriate duration of the suspension, Captain Hacken took into consideration other instances where members lied during Internal Affairs Division investigations and compared the seriousness of those offenses to that of Plaintiff's.[24] (*Id*. at pp. 33-34.) Captain Hacken ultimately determined that Plaintiff's offense was a lesser offense and thus imposed a five day suspension, whereas other members received suspensions of twenty days or more. (*Id*.)

In addition to IAD 2009-0339, Lt. Col. Kurtz also initiated a full investigation into whether Plaintiff and Yandrich lied about their relationship during Lt. Winterbottom's investigation of Major Stein. (Doc. 44-18, p. 2.) The investigator, Corporal Steven Wise ("Cpl. Wise"), reviewed Lt. Winterbottom's investigative report from IAD 2009-0190 in its entirety and noted that Plaintiff and Yandrich had both denied speaking on the phone until Lt. Winterbottom presented them with phone records showing otherwise, at which time they both changed their answers and said they misunderstood the question. (*Id*. at pp. 2-3.) Cpl. Wise also reviewed Plaintiff and Yandrich's leave records and found that they took coinciding leave sixty times between October 2007 and December 2010. (*Id*.) Using Internet usage reports, Cpl. Wise discovered that Plaintiff frequented a website for the Red

---

[24] Plaintiff received notice of his five day suspension without pay on December 3, 2010. (Burton Dep. at p. 98, Ex. 7.) After filing a grievance, his suspension was reduced to two days without pay. (*Id*. at Ex. 9.)

Roof Inn and subsequently learned, by visiting a Red Roof Inn near PSP headquarters, that Plaintiff checked in to the hotel 84 times. (*Id.*) Although two employees of the hotel gave descriptions of Plaintiff's hotel guest that did not match Yandrich, Cpl. Wise compared the dates of Plaintiff's hotel check-ins with Plaintiff and Yandrich's leave usage. (*Id.*) Of the 84 check-ins, twenty occurred on weekends when they were off duty and 46 occurred on dates that both Plaintiff and Yandrich utilized leave. While the evidence from the investigation tended to show that Plaintiff and Yandrich had been less than truthful about their relationship, neither was adjudicated pursuant to the investigation. (*See* Doc. 44-8.)

Major Stein and Lt. Harrison left the Bureau in 2009 and 2010, respectively. (Stein Dep. at pp. 9, 56; Harrison Dep. at p. 6.) Plaintiff remained in his position as supervisor and continued to receive positive performance evaluations. (*See* Burton Dep. at p. 103, Ex. 10.) He retired on July 8, 2011, five years short of full retirement.[25] In his deposition, Plaintiff explained the reasoning behind his decision to retire:

> I was at the end of my rope as far as everything that had happened to me. Pretty much from 2009 on, somewhere in 2009, I just stayed in my office. I came out to give my assignments to my subordinates, and I pretty much stayed in my office. You know, I felt like I was settling with [Lt] Margeson in 2008 with me being sent to the Farm Show, and them trying to take my position for no reason, and then being disciplined for doing something everybody else was doing that [Lt. Winterbottom] was aware of. . . .
>
> I was to the point where, you know, I could no longer stay within that cube of mine, and everything had just come to a head for me. I mean, it was an embarrassing and

---

[25] By retiring five years early, Plaintiff received fifty-percent of his pension for twenty years of service rather than the 75-percent he would have received after completing 25 years with PSP. (Burton Dep. at pp. 106-107.)

> humiliating situation to know that there are people sitting there looking at you, knowing that you got disciplined for doing something they were doing.  That in their minds, and they know that the department came after you.  Curtis Getz said himself, he said ['] I knew when you filed an EEO complaint, they were going to come after you[.'] I mean, so at that point in time I had had all I could take.  And I didn't know what else they were going to do.  If they can go ahead and do an investigation that was that deliberate against me, I'm [not] going to take a chance that they're going to take my medical away or pension away from me.

(Burton Dep. at pp. 104-105.)

## B.    Procedural History

On March 17, 2009, Plaintiff dual filed claims of discrimination and retaliation with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Office ("EEOC") alleging that he was discriminated against on the basis of his race in the Sergeant promotion process and in the decision to issue him the Supervisor's Notation, and that he was retaliated against for complaining to Lt. Harrison about Major Stein's sexual comments in the form of his assignment to the Farm Show detail.  (Doc. 41-9, pp. 5-14 of 31.)  On November 5, 2009, Plaintiff filed another charge of discrimination with the EEOC and PHRC alleging retaliation for filing his first EEOC and PHRC complaint in the form of a disciplinary investigation.  (Doc. 41-9, pp. 16-18 of 31.)  Plaintiff received a Notice of Right to Sue from the United States Department of Justice Civil Rights Division with regard to his first charge on July 23, 2011, and a Notice of Right to Sue on his second charge on July 27, 2011.  (Doc. 44-14.)

After receiving the notices of his right to sue, Plaintiff filed a complaint in the instant matter on October 21, 2011 (Doc. 1), and an amended complaint on

July 18, 2012 (Doc. 18).[26]   Defendants filed their answer on July 20, 2012. (Doc. 20.)  Following discovery, Defendants filed their motion for summary judgment on August 12, 2013. (Doc. 38.)  The motion was accompanied by Defendants' statement of material facts (Doc. 39), brief in support (Doc. 40), and exhibits (Doc. 41).  On September 17, 2013, Plaintiff filed his opposition to the motion for summary judgment (Doc. 44),[27] response to Defendants' statement of material facts (Doc. 44-1), and exhibits (Doc. 44, attachments 1-19).  Defendants filed a reply brief on October 8, 2013.  (Doc. 48.)  Therefore, the motion is fully briefed and ripe for disposition.

## II.        Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

---

[26]   The amended complaint contains the following six counts: Count I - Race Discrimination in Violation of Title VII Against PSP; Count II - Race Discrimination in Violation of the PHRA Against PSP; Count III - Retaliation in Violation of Title VII Against PSP and Lt. Winterbottom Collectively and Individually; Count IV - Retaliation in Violation of the PHRA Against PSP and Lt. Winterbottom Collectively and Individually; Count V - Retaliation in Violation of Title VII; Count VI - Retaliation in Violation of the PHRA Against PSP and Lt. Winterbottom Collectively and Individually; Count VII - Retaliation in Violation of 42 U.S.C. § 1983 Against Lt. Winterbottom; Count VIII - Retaliation in Violation of 42 U.S.C. § 1983 Against Lt. Winterbottom.  (Doc. 19.)

[27]   The court notes that, despite being granted an extension of time to file his opposition to the motion for summary judgment, Plaintiff's opposition was untimely filed.  As the court preferred to dispose of Defendants' motion for summary judgment on the merits rather than on a procedural defect, the court has overlooked Plaintiff's shortcomings in this instance.

requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*, 477 U.S. at 248; *Gray v. York Newspapers, Inc*., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue as to a material fact is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). In determining whether there is a genuine issue of material fact, the court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted). In addition, the "court may not make credibility determinations or engage in any weighing of the evidence." *Anderson*, 477 U.S. at 255.

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id*. at 325. In order to avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations contained in his or her pleadings, but is required by Rule 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id*. at 324. Summary judgment should be granted where the party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

With respect to the sufficiency of the evidence provided by the nonmoving party, the court should grant summary judgment where the party's evidence is merely colorable, conclusory or speculative. *Anderson*, 477 U.S. at 249-50. That is, there must be more than a scintilla of evidence supporting the nonmoving party's claims and more than some metaphysical doubt as to the material facts. *Id*. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.          Discussion

Plaintiff alleges that he suffered adverse employment actions for unlawful discriminatory and retaliatory reasons in violation of federal and Pennsylvania law. Defendants argue that Plaintiff failed to exhaust his administrative remedies; that Plaintiff cannot prove a prima facie case of discrimination or retaliation and, even if he can prove a prima facie case, Defendants had legitimate nondiscriminatory and nonretaliatory reasons for taking the challenged employment actions; that Title VII bars recovery against individual defendants; and that Plaintiff has failed to prove a First Amendment claim for freedom of association. (*See* Docs. 40 & 48.) The court will address each argument in turn.

## A.    Procedural Analysis

At the outset, PSP and Lt. Winterbottom argue that they are entitled to summary judgment on the Title VII claims asserted in Counts I through VI because Plaintiff failed to exhaust his administrative remedies.  Plaintiff responds that his claims are properly within the scope of his EEOC charges and he has therefore exhausted his administrative remedies.

Prior to filing a Title VII suit in federal court, a plaintiff must first exhaust his administrative remedies by filing a discrimination charge with the EEOC. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997); *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984).  Once a plaintiff has done so, he may file suit for discrimination pursuant to Title VII, but may only properly raise those claims that are within the scope of the EEOC charge.[28]  *Waiters*, 729 F.2d at 237.  To determine whether a plaintiff has exhausted his administrative remedies, the court must evaluate "whether the acts alleged in the subsequent suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."  *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996).  Claims are within the scope of the original charge if "they arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge."  *Waiters*, 729 F.2d at 234; *see also Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999) (explaining that the "parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to

---

[28]  For the sake of simplicity, the court will refer to Plaintiff's administrative charges, which were dually filed with the EEOC and the PHRC, as EEOC charges.

grow out of the charge of discrimination, including new acts which occurred during the pendency of the proceedings before the Commission").

In the instant matter, Plaintiff filed his first EEOC charge on March 17, 2009, for discrimination and retaliation in which he complained, *inter alia*, that he and Yandrich were continually being warned about spending time together in conversation; that Lt. Harrison stated, "whenever a black man talks to a white woman, it's an issue"; that he was denied a promotion to Sergeant after being assigned a panel of assessors that included Lt. Margeson; and that he was issued a Supervisor's Notation for talking to Yandich for extended periods of time while white employees were not reprimanded for talking to each other at length. (Doc. 41-9, pp. 6-7.) At Count I of his EEOC charge, Plaintiff alleged race discrimination, claiming that Major Stein and Lt. Harrison had a problem with a black man and white woman engaging in conversation. (*Id*. at p. 7.) At Count II, he alleged retaliation for reporting that Major Stein had made inappropriate sexual comments in the form of being assigned to an outside detail despite his rank of Corporal Supervisor. (*Id*. at p. 8.) In his second EEOC charge, filed on November 5, 2009, Plaintiff alleged retaliation in the form of an investigation and disciplinary charges

being lodged against him as a consequence of his filing the initial EEOC complaint.[29]

Given that Plaintiff's Title VII claims for discrimination include his suspension without pay, which was not issued until December of 2010, and constructive discharge in the form of his retirement on July 8, 2011 (Doc. 40, p. 4), Defendants contend that Plaintiff has not exhausted his administrative remedies insofar as these additional claims are not subsumed within his EEOC charges. Specifically, Defendants assert that the suspension and retirement are not closely related to the events of alleged discrimination in 2008, *i.e.*, the discipline and failure to promote, and that the EEOC did not have time to adequately investigate Plaintiff's

---

[29] In a letter attached to his second charge of discrimination, Plaintiff wrote:

Following my EEOC Complaint and the filing of my [PHRC] Complaint, I was retaliated against.

I have been treated in a disrespectful and disparate and retaliatory manner by Lt. Winterbottom who is allegedly investigating allegations made against Major Stein. As a consequence of my allegations against the [PSP], I now find myself on disciplinary charges for allegedly reading a confidential and privileged document which happened to be placed in my mailbox where the incoming mail is dropped. Obviously, it was not my intent to read the document and it was inadvertently opened and to be disciplined for this is plainly ridiculous and significant[ly] overbroad.

Further, I have been the target of an ongoing investigation on an event that happened three years ago in which everyone participated.

I continue to be singled out for disparate discipline on the basis of my race and I am filing this additional complaint for retaliation accordingly. Further, my case is allegedly, closed, at least from an administrative standpoint and yet Lt. Winterbottom continues to ask questions and continues to "investigate" me.

I am naming Lt. Winterbottom as an aider and abettor.

(Doc. 41-9, p. 17.)

constructive discharge as the right to sue letter was issued just fifteen days after his retirement. (*Id.*) Plaintiff argues that the suspension and events leading to the constructive discharge arose during the pendency of the EEOC investigation and were closely related to the original charges. (Doc. 44, pp. 7-8.)

Generally, a complainant need not file an EEOC charge as to "new acts that occur during the pendency of the case which are fairly within the scope of an [existing charge] or the investigation growing out of that [charge]." *Waiters*, 729 F.2d at 237. In *Waiters*, the plaintiff's EEOC charge included a retaliation claim relating to the filing of an informal complaint, but the plaintiff's Title VII action centered on other alleged retaliatory conduct that took place after the filing of the EEOC charge. *Id.* at 236. While the Third Circuit recognized that "the allegedly discriminatory officials and acts [were] different," the court found that the retaliation claims raised in the Title VII action were within the scope of the EEOC charge because "the core grievance – retaliation – [was] the same." *Id.* at 238. Likewise, in *Albright v. City of Philadelphia*, 399 F.Supp.2d 575, 584-85 (E.D. Pa. 2005), the district court held that, "continued acts of retaliation following the filing of [the plaintiff's] second EEOC charge [were] within the scope of the first charge" because retaliation was "at the core" of the allegations contained in the charge. *See also Harman v. York City Sch.*, No. 12-cv-2033, 2013 WL 3242407, *4 (M.D. Pa. June 25, 2013) (finding that an additional claim raised in the plaintiff's complaint, although not included in the EEOC charge, fell within the scope of the "core grievance" of the charge). Courts are typically less sympathetic, however, toward unexhausted allegations that arose prior to the filing of the EEOC charge as opposed to related events that occurred after the filing of the charge. *DeLa Cruz v. Piccari*

*Press*, 521 F.Supp.2d 424, 434 (E.D. Pa. 2007); *see also Young v. School Dist. of Phila.*, No. 06-cv-4485, 2009 WL 3072534, *11 (E.D. Pa. Sept. 24, 2009) (concluding that unexhausted allegations which took place prior to the filing of the EEOC charge could not be raised in plaintiff's Title VII action).

In this case, Plaintiff's Title VII suit unquestionably includes claims not specifically raised in his EEOC charges.  However, the core grievances of the charges include discrimination and retaliation and therefore could encompass related forms of discrimination and retaliation not specifically identified within them. Significantly, the essential facts alleged in each charge are the same as those presented in his federal claims.  While the suspension and constructive discharge had yet to occur at the time of the second filing, both acts grew out of the same core and were simply additional forms of related retaliation, *i.e.*, another form of discipline and constructive discharge resulting from mounting forms of discrimination and retaliation.  Moreover, the suspension and constructive discharge both occurred during the pendency of the EEOC actions as Plaintiff filed the charges in March and November of 2009 and the EEOC issued his right to sue letters on July 23, 2011, and July 27, 2011.  *See Harman*, 2013 WL 3242407 at *4 (finding that the plaintiff's claims concerning discrimination that allegedly occurred after he filed his EEOC charge were properly exhausted because the conduct occurred before the EEOC issued its right to sue letter).  Accordingly, the court concludes that the additional claims are within the scope of Plaintiff's EEOC charges and therefore Plaintiff has exhausted his administrative remedies with respect to his Title VII claims.

### B. Substantive Analysis

Both Plaintiff's amended complaint and brief in opposition to Defendants' motion for summary judgment suffer from vagueness and inconsistency and are laden with generalities heaped upon conclusory statements, which Plaintiff predicates on nothing more than his own beliefs. In fact, a careful analysis of the record demonstrates that Plaintiff's allegations simply are not supported. These defects are fatal to Plaintiff's case on all counts, and for the reasons that follow, the court will grant Defendants' motion for summary judgment in its entirety.

## 1. Discrimination Claims (Counts I and II)

In Counts I and II of the amended complaint, Plaintiff asserts racial discrimination by PSP in violation of Title VII and the PHRA. Under Title VII, it is unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, color, religion, sex, or national origin.

42 U.S.C. § 2000(e)(2) (emphasis added). The PHRA likewise prohibits discrimination by an employer on the basis of race.[30] *See* 43 P.S. § 955.

The Supreme Court set forth the analytical framework for employment discrimination cases based on circumstantial evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to the *McDonnell Douglas* framework, a plaintiff must first present evidence sufficient to convince a reasonable factfinder of

---

[30] The court will analyze Plaintiff's Title VII and PHRA claims together inasmuch as claims brought pursuant to Title VII and the PHRA are generally analyzed under the same standards. *See Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 318-19 (3d Cir. 2008); *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643-44, n.4 (3d Cir. 1998). Hence, a determination that Plaintiff failed to demonstrate a prima facie case of discrimination under Title VII is also dispositive of Plaintiff's failure under the PHRA. *See Zezulewicz v. Port Auth. of Allegheny Cnty.*, 290 F. Supp. 2d 583, 601 (W.D. Pa. 2003) (noting that discrimination claims brought under the PHRA are analyzed under the same standards as their federal counterparts).

all the elements of a prima facie case of discrimination.  *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citations omitted).   To establish a prima facie case of discrimination in violation of Title VII, the plaintiff must show by a preponderance of the evidence (1) that he belongs to a protected class, and (2) that he suffered an adverse employment action (3) under circumstances leading to an inference of unlawful discrimination.[31]  *Broomer v. Loch Haven Univ.*, No. 4:cv-09-27, 2012 WL 1059745, *8 (M.D. Pa. Feb. 7, 2012) *(citing Page v. Trustees of Univ. of Pa.*, 222 F. App'x. 144, 145 (3d Cir. 2007).  To establish an adverse employment action, a plaintiff must show that he or she experienced:

> [a] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . . A tangible employment action in most cases inflicts direct economic harm.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (defining an adverse employment action as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment").  As to the final prong, a plaintiff can establish an inference of discrimination by showing that he or she was treated differently than similarly situated employees outside of the protected class.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000).

---

[31]  Courts frequently, but not always, require the plaintiff to show an additional element – that he or she was qualified for the job in question.  *See, e.g. Geraci v. Moody-Tottrop, Int'l, Inc.*, 82 F.3d 578, 580-81 (3d Cir. 1996); *McDonnell Douglas*, 411 U.S. at 802; *Broomer*, 2012 WL 1059745 at *8.  Given the claims asserted in this case, the court finds it unnecessary to include this additional element in its analysis.

If the plaintiff succeeds in presenting a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.*; *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). In this regard, the employer's burden is "relatively light." *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 240 (3d Cir. 2007). Indeed, the employer is only required to show that its actions *could* have been motivated by the proffered legitimate nondiscriminatory reason; proof of actual causation is not required. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000)*; Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

Finally, if the employer articulates a legitimate nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's proffered reason is actually pretextual. *Sarullo*, 352 F.3d at 797. The plaintiff may meet this burden by presenting evidence from which a reasonable factfinder could either disbelieve the employer's articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). In doing so, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken. . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citation omitted). The court must then determine whether the plaintiff's evidence is sufficient "to permit a reasonable factfinder to conclude that

the [employer's] reasons are incredible." *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996).

Plaintiff alleges that PSP unlawfully discriminated against him on the basis of his race by issuing him a written reprimand in the form of a Supervisor's Notation (Doc. 19, ¶ 59), suspending him without pay (*Id*. at ¶ 72), and failing to promote him to Sergeant (Doc. 44, p. 6 of 25). PSP does not dispute that Plaintiff is a member of a protected class; rather, it argues that Plaintiff cannot prove he suffered from an adverse employment action and/or that similarly situated non-protected class employees were treated more favorably. (Doc. 48, p. 3 of 16.) Moreover, even if Plaintiff is able to present a prima facie case, PSP asserts it had a legitimate nondiscriminatory reason for taking each of the challenged employment actions. (*Id*.) The court will address each argument in turn.

### a. <u>Supervisor's Notation</u>

Plaintiff argues that the Supervisor's Notation he received for excessively socializing with Yandrich was an adverse employment action. In order for a reprimand to amount to an adverse employment action, it must effect a material change in the terms or conditions of the plaintiff's employment. *Harris v. Harley-Davidson Motor Co. Operations, Inc*., 09-cv-1449, 2011 WL 6003191, *5 (M.D. Pa. Sept. 28, 2011). In *Weston v. Pennsylvania*, 251 F.3d 420, 430-31 (3d Cir. 2001), the Third Circuit concluded that written reprimands not permanently affixed to an employment record do not constitute an adverse employment action under Title VII. In finding that the reprimands did not alter the terms or conditions of the plaintiff's employment in any way, the Third Circuit noted that the plaintiff was "not demoted in title, did not have his work schedule changed, was not reassigned to a different

position or location . . . , did not have his hours or work changed or altered . . . and . . . was not denied any pay raise or promotion as a result of these reprimands." *Id.* at 431. Applying this reasoning to the matter *sub judice*, the Supervisor's Notation does not constitute an adverse employment action because it did not alter Plaintiff's employment status. *See Santiago v. York City*, No. Civ. A.1:CV02-1217, 2005 WL 2347236, *7 (finding that a written reprimand to be removed from an employment file after two years did not constitute an adverse employment action as it did not alter the plaintiff's employment status). Thus, Plaintiff has failed to establish the second element of his prima facie case as to the Supervisor's Notation.

Moreover, Plaintiff likewise failed to satisfy the final element of his prima facie case, *i.e.*, an inference of discrimination. One method of establishing an inference of discrimination is to proffer evidence that similarly situated coworkers outside of the protected class were treated more favorably. *Burlington v. News Corp.*, 759 F.Supp.2d 580, 592 (E.D. Pa. 2010); *see Jones v. School Dist. of Phila*, 198 F.3d 403, 411 (3d Cir. 1999). While Plaintiff avers that PSP "failed to subject similarly situated white members to discipline for casual conversations with their co-workers" (Doc. 19, ¶ 61), he fails to put forth sufficient evidence to support his claim. *See, e.g., Opsatnik*, 335 F. App'x at 223 (examining the evidence of 24 similarly situated coworkers that Plaintiff submitted to the court to determine the validity of his claim). Rather, in a faltering attempt to support his claim, Plaintiff asserts in his brief that "socializing among a white couple was not a problem [at PSP]" (Doc. 44 p. 9 of 25) and cites to a portion of Lt. Harrison's deposition wherein defense counsel questioned Lt. Harrison regarding the amount of time Cpl. Reese (a white man) spent talking to his girlfriend (a white woman) at the office. (Harrison

Dep. at pp. 27-30.) While it is true that Lt. Harrison did not issue the "white couple" a Supervisor's Notation, Lt. Harrison testfied that the couple only talked for about ten to fifteen minutes in the morning and frequently ate lunch together. (*Id*. at pp. 28-29.) Thus, the situation is hardly comparable to that of Plaintiff and Yandrich who spent an excessive amount of time socializing and refused to comply with repeated requests to discontinue the behavior. (*See* Burton Dep. at Ex. 1.)

Moreover, Plaintiff fails to establish similarly situated persons were treated differently. As to the unidentified white members who purportedly engaged in lengthy conversations without being reprimanded, they were not employed within Plaintiff's Division and therefore were not under Lt. Harrison's supervision. (*See* Burton Dep. at pp. 29-30; Doc. 44-15, p. 23.) Similarly situated employees are those who have "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp*., 335 F. App'x 220, 223 (3d Cir. 2009). Consequently, these other white members were not "similarly situated" for purposes of establishing an inference of discrimination. As for the similarly situated members within Plaintiff's Division, Lt. Harrison testified that he did, in fact, give other members Supervisor's Notations for "not taking care of business" (Harrison Dep. at pp. 18-19), and Plaintiff has failed to put forth any evidence to rebut Lt. Harrison's testimony. Moreover, Lt. Harrison issued Yandrich – a white female – a written reprimand contemporaneously with the supervisor's notation issued to Plaintiff.

Finally, insofar as an argument could be made that all of the members within the Bureau of Research and Development were under the control of Major

Stein and therefore could be considered "similarly situated," Plaintiff has failed to put forth any evidence to support his claims that the other members excessively socialized.  Instead, Plaintiff relies almost exclusively on his testimony and affidavit without citing or producing any affirmative evidence outside of his own allegations. (*See* Doc. 19, ¶ 61; Doc. 44., pp. 8-10; Doc. 45, ¶ 3.)  Federal Rule of Civil Procedure 56(c)(1) states that the nonmovant must establish a genuine dispute of material fact by either "citing to particular parts of materials in the record" or "showing that the materials cited [by the movant] do not establish the absence or presence of a genuine dispute.  In doing so, a nonmoving party "may not simply sit back and rest on the allegations in its complaint."  *Corneal v. Jackson Twp.*, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), *aff'd*, 94 F. App'x. 76 (3d Cir. 2004).  Thus, the court finds that Plaintiff has failed to establish the final element of his prima facie case.

Finally, even assuming, *arguendo*, that Plaintiff had presented a prima facie case of race discrimination as to the Supervisor's Notation, PSP has articulated a legitimate nondiscriminatory reason for the employment action, *i.e.*, the excessive socialization and failure to comply with numerous verbal requests to reduce the length of the conversations (*see* Harrison Dep. at pp. 22-23; Doc. 41-7 at p. 17 of 33; *See* Stein Dep. at pp. 12-13), and thus the burden shifts back to Plaintiff to show that PSP's proffered reasons for the Supervisor's Notation are pretextual.  In attempting to sustain this burden and rebut Defendant's legitimate reason, Plaintiff asserts that "[t]he purpose of the [S]upervisor's [N]otation was to deter and punish [Plaintiff] for associating with a white female co-worker" and that "[i]t was an unambiguous statement that a black socializing with a white woman is not acceptable behavior"

(Doc. 44, pp. 8-9); however, Plaintiff again failed to allege facts sufficient to support his claims and instead relies on his own bold, conclusory statements. It is basic civil procedure that on a motion for summary judgment, the nonmoving party is entitled to all reasonable inferences to be drawn in his favor. The key word, however, is *reasonable*. The fact that Plaintiff, a black male, was reprimanded for excessively speaking with a coworker, who happened to be a white female, does not, in and of itself, warrant an inference that the reprimand was issued because of his race. As Lt. Harrison explained in his interview with Lt. Winterbottom, he was compelled to issue the Supervisor's Notation after he observed Plaintiff and Yandrich in conversation for nearly eight hours over the course of two work days. (Doc. 44-15, p. 22-24 of 101; 44-1, ¶ 47.) It speaks for itself that an employer has a strong interest in ensuring a certain level of conduct and productivity within the office; an employee cannot spend an excessive amount of time socializing in the workplace and then legitimately claim its discriminatory when he is challenged for doing so.

## b.   Suspension Without Pay

Plaintiff rather inarticulately argues that his two day suspension without pay was a result of a racially motivated investigation wherein Plaintiff, as the only African-American among a group of employees who engaged in some inappropriate lunchroom banter, was singled out due to his race and subjected to an intrusive investigation, which ultimately uncovered the information giving rise to his suspension. (Doc. 44, pp. 10-11.) He reasons that, had other employees who participated in the same lunchroom behavior been subjected to similar investigations, information may have been discovered about them leading to additional suspensions. (*Id*.) Consequently, he asserts that the discriminatory action was not the suspension

36

itself but rather the failure to investigate or suspend anyone else.  (*Id.*)  PSP argues

that an investigation, in and of itself, is not an adverse employment action as it does

not cause any significant change in job status, responsibilities, or benefits.  In

addition, PSP calls attention to the fact that Plaintiff failed to present any evidence of

similarly situated employees who were treated more favorably in the disciplinary

process.  (Doc. 48, p. 6 of 16.)  Recognizing the Plaintiff indeed failed to proffer any

comparator evidence with regard to the suspension itself and agreeing that a mere

investigation is not an adverse employment, the court will infer that Plaintiff, in

focusing on the allegedly racially motivated investigation, is trying to establish a

causal nexus between the harm suffered, *i.e.*, the suspension, and his membership in

a protected class.

      The Third Circuit has counseled that the prima facie discrimination case

is intended to be a flexible standard.  *Sarullo,* 352 F.3d at 797-98 ("[T]he prima facie

test remains flexible and must be tailored to fit the specific context in which it is

applied.")).  To establish an inference of discrimination, a plaintiff need not

explicitly show that similarly situated coworkers were treated more favorably with

regard to the adverse employment action.  *See Burlington*, 759 F. Supp. 2d at 592.  It

is sufficient for a plaintiff to present evidence that "establishes a causal nexus

between the harm suffered and the plaintiff's membership in a protected class, from

which a [reasonable] juror could infer, in light of common experience, that the

defendant acted with discriminatory intent." *Id.* (quoting *Anderson v. Wachovia

Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir. 2010) (discussing prima facie case in a

Section 1981 context)); *Sarullo*, 352 F.3d at 798 (stating that the plaintiff "must

establish some causal nexus between his membership in a protected class" and the

adverse employment action to establish a prima facie case of discrimination in a Title VII case). Ultimately, the focus remains on whether the plaintiff is able to establish – through evidence of similarly situated employees being treated more favorably or otherwise – that his protected trait "played a role in the employer's decision-making process and had a determinative influence on the outcome of that process." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004).

In the matter *sub judice*, Plaintiff's efforts to create an inference of discrimination by showing that his race played a role in PSP's decision to investigate him fails for several reasons. First, Plaintiff's argument is premised entirely upon the fact that PSP did not investigate the other nonprotected employees who engaged in the same lunchroom banter. Specifically, he argues that this selective investigation necessarily leads to an inference that the investigation into Plaintiff was racially motivated. While it is undisputed that the other nonprotected members from the lunch table were not investigated (*see, e.g.*, Winterbottom Dep. p. 92-95), this fact alone is insufficient to raise an inference that the investigation was discriminatory. Rather, Plaintiff must present evidence showing that IAD 2009-0339 was initiated solely – or, at the very least, primarily – because the investigators and/or disciplinary officers learned that Plaintiff made an inappropriate sexual comment in the lunchroom. Without such evidence, Plaintiff cannot show that he was singled out from the group – a fact upon which his entire argument rests.

The record clearly demonstrates, however, that IAD 2009-0339 was not initiated primarily because of Plaintiff's comments in the lunchroom. Rather, the investigation was initiated due to several pieces of information that were discovered in the course of the investigation into Plaintiff's allegations against Major Stein,

including Plaintiff repeating inappropriate sexual comments he attributed to Major Stein to his subordinates, opening a confidential correspondence addressed to another member, being less than truthful in answering questions related to the confidential correspondence, and admittedly making inappropriate sexual comments in the lunchroom. (Doc. 41-6, p. 2 of 40.) Each of these infractions violated clearly established PSP protocol. Thus, despite Plaintiff's assertion to the contrary, the evidence shows that the investigation was initiated due to the cumulative nature of Plaintiff's infractions as opposed to the lunchroom joking alone. Consequently, Plaintiff has failed to establish an inference of discrimination as to the investigation.

In addition, Plaintiff argues that, had it not been for the discriminatory investigation, he would not have been suspended since the primary basis for the suspension was Plaintiff's purported untruthfulness in answering questions related to the confidential correspondence he inadvertently read. Plaintiff argues:

> [T]he entirety of the bases used to justify the Plaintiff's suspension stemmed from the investigation of . . . Plaintiff. That is, there was no investigation of the lunch-time joking by . . . Plaintiff until Lt. Winterbottom began her investigation of him. But-for that investigation there would not have been a letter for . . . Plaintiff to accidently read and be accused of lying about (which [PSP] assert[s] was the primary basis for the suspension). Since no one else was investigated, the other participants were not vulnerable to disciplinary action. Accordingly we will never know if an investigation would have uncovered other acts of alleged misconduct.

(Doc. 44, p. 11 of 26.) However, Plaintiff's but-for argument is misguided. Lt. Winterbottom did not uncover the possibility that Plaintiff made inappropriate lunchroom comments during her subsequent investigation into Plaintiff's infractions.

Rather, Lt. Winterbottom first learned of the alleged comments when Major Stein made the accusation against Plaintiff while being questioned regarding Plaintiff's accusations against him.  Thus, at that point, the investigation into Major Stein turned into the classic, "he said, she said" situation, whereby Lt. Winterbottom was compelled to look into the credibility of each accuser.  In doing so, she found that Major Stein's allegation against Plaintiff was corroborated by at least six other people in the Bureau (*see, e.g.*, Doc. 44-15, pp. 1, 94-100), whereas no one within the Bureau, aside from Yandrich, corroborated Plaintiff's accusations against Major Stein (*see, e.g.*, *id*. at pp. 24, 94-100; Doc. 41-6, p. 11).    The letter which Plaintiff inadvertently read was in regard to one of these interviews  (Doc. 44-15, p. 19 of 101), and thus it existed because of the investigation of Major Stein.

In addition, with regard to whether the adverse action itself, *i.e*., the suspension, was discriminatory, Plaintiff has similarly failed to put forth any evidence leading to an inference of discrimination.  (*See* Doc. 44, p. 12 of 26.) Plaintiff was suspended for his violations of three PSP field regulations amounting to his unbecoming conduct, his failure to truthfully answer questions in an investigation, and his engaging in harassment.  (Burton Dep., Exhibit 8 at p. 1, 12, 15.)  Plaintiff did not – indeed he could not – present any evidence showing a nonprotected employee in violation of three field regulations who received discipline less severe than that of Plaintiff's.  In fact, the evidence of record reveals that other nonprotected employees within the Bureau were disciplined much more severely for violations of a similar nature, receiving 25 to thirty day suspensions for unbecoming conduct and untruthfulness in an investigation.  (*See e.g*., Sanzick Dep. at p. 11; Bendl Dep. at pp. 14-15; Beard Dep. at pp. 17-18; Hinkle Dep. at p. 9; Getz Dep. at

pp. 13-14.)  For all these reasons, Plaintiff has failed to raise an inference of discrimination as to the investigation or the suspension, and his prima facie case fails as a result.

Even assuming, *arguendo*, that Plaintiff had presented a prima facie case of discrimination as to the investigation and subsequent suspension, PSP has provided a legitimate nondiscriminatory reason for suspending him that Plaintiff is unable to rebut.  The record establishes that the suspension was the result of the cumulative nature of Plaintiff's transgressions that were uncovered during the investigation into Plaintiff's allegations against Major Stein and sustained during the subsequent investigation into Plaintiff.  Moreover, Plaintiff conceded that he violated PSP's code of conduct as to two of the charges.  While he may disagree with the ultimate adjudication and disciplinary action, he has not offered any evidence to show that the legitimate nondiscriminatory reasons provided by PSP for the suspension were pretextual.  *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken.").  Moreover, despite being found in violation of three field regulations, Plaintiff was only suspended for two days, a punishment much less severe than those of similarly situated nonprotected employees.  For these reasons, the court concludes that Plaintiff is unable to rebut PSP's proffered legitimate nondiscriminatory reasons for the suspension.

### c.  Failure to Promote

Plaintiff also alleges that he was discriminated against on the basis of his race in the Sergeant promotion process due to Lt. Margeson's presence on one of the Oral Board panels as well as PSP's failure to accommodate his request for an

alternate panel.[32]  (Doc. 19, ¶¶ 26-27.)  Plaintiff's allegation regarding Lt. Margeson appears to be based solely on his own conclusion that Lt. Margeson held some racial animus toward him.  Plaintiff attempts to support this conclusion using his deposition testimony that Lt. Margeson spoke to Yandrich about the amount of time she was spending with Plaintiff at work yet, to Plaintiff's knowledge, did not talk to any of the white members about the amount of time they spent in conversation at the office. (Burton Dep., pp. 59-60.)  Despite Plaintiff's subjective feelings on the matter, the mere fact that Lt. Margeson spoke to Yandrich about her interactions with Plaintiff is hardly sufficient to establish an inference of racial discrimination.  As stated previously, a supervisor has reason to be concerned over any excessive socialization occurring within his office.  In addition, Plaintiff acknowledged in his deposition that Lt. Margeson did nothing to throw him of track during the exam (Burton Dep. at pp. 66-68), and Lt. Margeson's scoring of Plaintiff was in line with that of the other assessors (*see id*. at Ex. 5, pp. 2-3).  Thus, there is no evidence to support Plaintiff's contention that Lt. Margeson discriminated against Plaintiff in the promotion process.  Rather, Plaintiff's less than adequate scores were the reason he did not receive a promotion.

The undisputed evidence of record likewise fails to support Plaintiff's claim that PSP's refusal to appoint a new panel was due to a discriminatory motive. Upon learning that Lt. Margeson was assigned to one of his panels, Plaintiff

---

[32]  Plaintiff did not include any arguments regarding the promotion process in his brief, citing PSP's failure to do the same, and asserts that PSP concedes his argument that he was discriminated against in the promotion process.  (Doc. 44, p. 2) In its reply brief, PSP responds that it was not clear from Plaintiff's amended complaint that he intended to allege a failure to promote claim, and subsequently briefs the issue.  (Doc. 48, p. 4.)  The court concurs that Plaintiff's allegation in this instance was less than clear.

immediately objected to the assignment and requested an alternate assessor. The board offered him two options: to remove Lt. Margeson from the panel, thereby leaving two assessors on that particular panel, or to have his scores assessed by an independent testing firm to check for substantially different scores between Lt. Margeson and the other assessors. (*See* Burton Dep., Exhibit 3.) Plaintiff chose the latter option and the scores from both panels were similar, ranging between 3.86134 and 4.79720 out of 9. (*Id*. at Ex. 5, pp. 2-3.) Far from presenting an inference of discrimination, the evidence shows that Plaintiff was not promoted because his scores from both panels were mediocre (*see id.* at p. 4), and thus, like the first time he tested, he was not promoted due to his performance. (*Id*. at pp. 75-76.)

### d.     Lt. Harrison's Remark

Several times throughout his amended complaint and brief in opposition, Plaintiff mentions Lt. Harrison's remark in an attempt to bolster his argument of intentional discrimination with regard to the employment action at issue. While the remark, at best, reflects an arguably racially-charged point of view, Lt. Harrison explained that he made the comment within the context of his own experiences as an African-American in an interracial relationship. (Doc. 44-15, p. 23; Harrison Dep. at p. 26.) Although Plaintiff testified in his deposition that he interpreted Lt. Harrison's comment as a reflection of what Lt. Harrison had witnessed within the Bureau as the EEO liaison (Burton Dep. at p. 29), Plaintiff told Lt. Winterbottom that he was uncertain if Lt. Harrison was speaking in general terms about society or more specifically about PSP. (Doc. 44-15, p. 11.) Regardless, one individual's general feeling of unease about the treatment of interracial friends or couples – whether inside or outside of PSP – does not, by itself, establish a prima

facie case of racial discrimination. Moreover, while Plaintiff avers in his amended complaint that Major Stein's purpose in acknowledging Lt. Harrison's comment "was to endorse Lt. Harrison's comment[] and to threaten [Plaintiff] into not having any further conversations with Ms. Yandrich" (Doc. 19, ¶ 33), Plaintiff nevertheless testified that Major Stein told Plaintiff he did not agree with Lt. Harrison's comment. (Burton Dep. at. pp. 31-32.)

Accordingly, based upon the record before the court viewed in the light most favorable to Plaintiff, Plaintiff has failed to establish a prima facie case of racial discrimination with regard to any of the challenged employment actions. Even upon examining the employment actions collectively, both adverse and non-adverse, the court finds no indication that nonprotected members of PSP were held to less strict standards vis-a-vis the rules of conduct, received less warnings or discipline, or were treated more favorably in the promotion process. Plaintiff's mere disagreement with his supervisors' decisions and his unsupported opinion that the decisions were racially motivated are insufficient, as a matter of law, to establish a prima facie case of discrimination. Accordingly, PSP's motion for summary judgment as to Plaintiff's claims in Counts I and II of the amended complaint will be granted.

## 2.   Retaliation Claims (Counts III through VI)

In Counts III through VI of the amended complaint, Plaintiff asserts claims against both PSP and Lt. Winterbottom for unlawful retaliation in violation of Title VII and the PHRA. To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in activity protected by Title VII;[33] (2) the

---

[33]   Congress has enunciated that protected activity consists of (a) opposing an employment practice prohibited by Title VII, or (b) filling a charge, testifying, assisting or otherwise participating in
(continued...)

44

employer took adverse employment action against him; and (3) there was a causal connection between his protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). The Supreme Court recently clarified that, as to the third element, a plaintiff making a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Tex. Sw. Med. Ctr. v. Nassar*, ---- U.S. ----, 133 S.Ct. 2517, 2534 (2013). This is a stricter causation standard than that required for discrimination claims where a plaintiff need only show that race, color, religion, sex, or national origin was a motivating factor in the employment action, rather than the but-for or sole cause. *Id*. at pp. 2522-523. In addition, the second element of the prima facie retaliation case also differs from that of a discrimination case. Here, a plaintiff must show "that a reasonable employee would have found the challenged actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (reiterating that the antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm)). If the plaintiff succeeds in establishing the prima facie case of retaliation, the familiar *McDonnell Douglas* burden-shifting framework applies wherein the burden of persuasion remains on the plaintiff. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

---

[33](...continued)
an investigation, proceeding, or hearing pursuant to Title VII. 42 U.S.C. § 2000e-3(a); *See, Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 567-70 (3d Cir. 2002).

In the instant case, Plaintiff's claims fail insofar as Plaintiff is alleging violations of Title VII and the PHRA by Lt. Winterbottom as an individual defendant. Indeed, the Third Circuit's disposition on individual liability under Title VII is clear – Congress did not intend to hold individual employees liable under this statute.[34] *See Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 184 (3d Cir.1997) (internal citations ommitted). Consequently, because she is being sued as an individual, Lt.. Winterbottom cannot be liable for retaliation in violation of Title VII, and thus she is entitled to summary judgment on Counts III through VI.

With regard to his claims against PSP, Plaintiff appears to predicate his retaliation claims on three protected activities: making informal complaints of discriminatory treatment to Lt. Harrison; reporting to Lt. Harrison and PSP's EEO office that Major Stein was making inappropriate sexual comments (Doc. 19 ¶¶ 84, 101); and filing a charge with the EEOC alleging discrimination and retaliation (Doc. 19, ¶¶ 118, 135). Plaintiff argues that PSP took numerous adverse employment actions against him in retaliation for his engaging in these so-called protected

---

[34] Title VII provides, in relevant part:

It shall be an unlawful employment practice for an **employer** - (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

It shall be an unlawful employment practice for an **employer** to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge . . . in an investigation, proceeding or hearing . . . .

42 U.S.C. § 2000e-2(a), 2000e-3(a) (emphasis added).

activities.[35] (Doc. 44, pp. 9-15.)  However, Plaintiff's brief in opposition continues to leave much to be desired as Plaintiff's arguments suffer from circumlocution and repeatedly rely solely on Plaintiff's own unsupported assertions and conclusions rather than zeroing in on any evidence to support his claims.   While the court has diligently traversed through, what is appropriately described as, "muddied waters" in an effort to address the case on the merits, the clarity of Plaintiff's arguments remains less than clear and the facts upon which he appears to rest his claims seem allusive. Although the court has spent a significant amount of time trying to decipher Plaintiff's cryptic logic, it fears it either missed Plaintiff's point or that the point is just absent from the averments.  The court believes the latter is a more accurate explanation.  Nevertheless, the court will do its best to address each of Plaintiff's claims.

---

[35] PSP does not dispute that Plaintiff engaged in protected activities; rather, it argues that Plaintiff cannot prove causation.  (Doc. 40, p. 14.)  While the court finds Plaintiff's report of Major Stein's alleged sexual harassment disingenuous in that no reasonable person could have thought two isolated comments, in the context of a joke – what sadly appears to be typical office behavior at PSP – amounted to sexual harassment and thus would not consider the activity protected under Title VII (*see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (holding no prima facie Title VII case established where no reasonable person could have believed she was complaining of protected activity), the court will defer to the defense as it was asserted by PSP and Lt. Winterbottom, and thus assume for purposes of this motion that the report of sexual harassment was, in fact, protected.  Moreover, the court is mindful of the Supreme Court's direction in *Burlington Northern*:

> [T]his standard does not require a reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge.  Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.  By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.

*Burlington N.*, 548 U.S. at 69 (internal citations omitted).

### a.    The Supervisor's Notation

In addition to asserting that the Supervisor's Notation was issued as a form of discrimination, Plaintiff argues that it was issued as an act of retaliation. While the basis for his retaliation claim is difficult to ascertain from Plaintiff's brief, it appears he is attempting to insert his belief that the reprimands he received for speaking to Yandrich for hours on end were a result of his supervisors' retaliation rather than his underperformance; however, his arguments are difficult – if not impossible – to follow. (*See* Doc. 44, pp. 14-15.) Inasmuch as Plaintiff is attempting to argue that he was retaliated against in the form of a Supervisor's Notation for complaining to Lt. Harrison and Major Stein that he was being treated less favorably than his white colleagues, his argument fails for the same reasons that the court articulated above in regard to his discrimination claim. Thus, the court will not belabor the issue here. Moreover, the mere fact that Plaintiff is asserting both discrimination and retaliation claims as to the Supervisor's Notation is fatal to his retaliation claim as the prima facie case of retaliation requires the plaintiff to show that the desire to retaliate was the *sole* basis, or the but-for cause, of the challenged employment action. *See Nassar*, 133 S.Ct. at 2528. Thus, Plaintiff cannot properly argue that the Supervisor's Notation was issued as both a form of discrimination *and* retaliation for Plaintiff making complaints to his supervisors. *Id.*

Further, Plaintiff has not addressed the reasonable employee aspect of this claimed adverse action in the context of a retaliation claim – a showing that is his burden. *See Moore*, 461 F.3d at 341. Even assuming, *arguendo*, that Plaintiff had attempted to make such a showing, the court finds that a reasonable employee would not have found the Supervisor's Notation materially adverse, since it is removed from

the employee's record after six months. Such a temporary employment action would not dissuade a reasonable employee from making or supporting a charge of discrimination. *See Weston*, 251 F.3d at 430-31. In fact, Plaintiff himself lodged both informal and formal complaints of discrimination *because* he received the Supervisor's Notation and therefore was not dissuaded from doing so.

### b.      The Threat and Attempted Removal

After complaining to Lt. Harrison about the treatment he received compared to white members, Major Stein called Plaintiff into his office to discuss the matter and stated, "you're a good worker and I would hate to lose you." (*See* Doc. 44, p. 14; Doc. 19, ¶¶ 31-33.) Plaintiff classifies this comment as "a clear threat" and claims that Major Stein followed through on the threat when he offered Plaintiff's position to Cpl. Reese at the December 2008 holiday party. (Doc. 44, p. 15.) Plaintiff alleges that Major Stein's offer was made in retaliation for Plaintiff's complaints of discrimination, *i.e.*, complaining to Lt. Harrison that he was getting reprimanded for excessive socialization while no one was saying anything to white members who were doing the same thing. (*See id.* at pp. 15-16.)

First, the court finds that an *attempt* to replace an employee – by an informal offer at a holiday party no less – hardly qualifies as an adverse employment action in that it would dissuade a reasonable employee from making or supporting a charge of discrimination. Indeed, as with the Supervisor's Notation, Plaintiff himself was not dissuaded from complaining of discrimination as he continued to make both informal and formal complaints after this incident. Second, Plaintiff has presented no evidence that suggests *any* causal connection between his allegations of discrimination and the job offer to Cpl. Reese, let alone evidence to suggest that the

activity was the but-for cause of Major Stein's decision to offer Plaintiff's job to Cpl. Reese. Instead, the evidence of record shows that Major Stein and Lt. Harrison contemplated moving Plaintiff to a new assignment within the Bureau in an attempt to address the excessive socialization since repeated requests for Plaintiff and Yandrich to reduce their amount of socialization went unheeded. (Doc. 48, p. 12 of 16.) It is true, as Plaintiff argues, that Lt. Harrison and Major Stein disagree as to who originally had the idea to transfer Plaintiff as part of a reorganization plan; however, they both agree that the motive behind doing so was the excessive socialization. Thus, while there may be a genuine issue of fact as to who suggested Plaintiff's transfer, such question is not material to the motivation behind the decision. Indeed, the motivation – excessive socialization – is undisputed by the evidence of record. Finally, Plaintiff does not dispute that he engaged in excessive socialization nor does he dispute that, on at least ten occasions, Lt. Harrison asked Plaintiff to reduce the amount of time that he spent socializing with Yandrich during the workday. (*See* Burton Dep. pp. 25, 28.) Certainly, it is the prerogative of the employer to make sure its employees are working diligently. Although Plaintiff points to his positive performance reviews to defend his workplace conduct (Doc. 44, p. 15 of 26), an employer undoubtably will lose the full benefit of its employee's work product if that employee is spending half of his day socializing with a coworker. Since Plaintiff refused to conform to the expectations of his employer, he cannot prove that but-for his complaints of discrimination, Major Stein would not have attempted to replace him.

### c. The Detail Assignments

Plaintiff alleges that, in retaliation for complaining about Major Stein's inappropriate comments, Lt. Harrison assigned Plaintiff to the Farm Show detail, "an assignment that was beneath his position" as a supervisor. (Doc. 19 ¶¶ 40-41.) In support of his allegation, Plaintiff argues that supervisors typically were not selected for details as they were needed in their supervisory capacity and that Lt. Harrison acknowledged Major Stein may have been giving Plaintiff a "shot." (*See* Doc. 44, pp. 16-17.)

The court finds that the four day assignment to the Farm Show detail does not amount to an adverse employment action insofar as a Title VII claim for retaliation is concerned.[36] The special order for the assignment specifically sought both Troopers and Corporals and therefore Plaintiff was qualified for the assignment as a Corporal. (Stein Dep. at pp. 15-16.) Moreover, even if Major Stein was giving Plaintiff a "shot" for reporting his inappropriate comments, the Third Circuit has counseled that, in evaluating whether actions are "materially adverse," the court "must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Moore*, 461 F.3d at 346 (quoting *Burlington N.*, 548 U.S. at 68). Normally petty slights, minor annoyances, and simple lack of good manners are unlikely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. *Burlington N.* 548 U.S. at

---

[36] The court notes that PSP did not dispute the adverse nature of the Farm Show assignment.

68. Here, the Farm Show detail was, at most, a petty slight or minor annoyance – and a detail for which Plaintiff was qualified. (Stein Dep. at pp. 15-16.) Even assuming, *arguendo*, that the Farm Show detail was an adverse employment action, Plaintiff cannot show that he was assigned to the detail in retaliation for reporting Major Stein's comments. The evidence shows that Lt. Harrison needed to assign Plaintiff to a detail assignment due to the decreased manpower within PSP. (Burton Dep. at Ex. 2.; Doc. 44-15, p. 16.) Lt. Harrison initially selected Plaintiff for the Oral Boards, but accommodated Plaintiff's request to send Sanzick instead. (Burton Dep. at pp. 43-44.) He then reassigned Plaintiff to the Farm Show, noting that Plaintiff was qualified for the detail and did not have to travel for the assignment. (Burton Dep. at Ex. 2.) Ultimately, Plaintiff has presented no evidence that suggests *any* causal connection between his allegations against Major Stein and his assignment to the Farm Show detail, let alone evidence to suggest that such activity was the but-for cause of the assignment. *See Nassar,* 133 S.Ct. at 2533.

### d.    The Investigations

Plaintiff also alleges that, rather than fully investigating his claims regarding disparate treatment and inappropriate comments by Major Stein, PSP retaliated against him for filing his charge with the EEOC[37] by making him the subject of lengthy and frivolous investigations "that [were] designed to cause embarrassment and humiliation to [Plaintiff]." (Doc. 19, ¶¶ 42-45.) The court finds these claims to be altogether baseless.

---

[37] Plaintiff is not clear in alleging whether he believes his complaint to the EEOC was the impetus behind PSP's investigation or whether it was the complaint he informally lodged internally with PSP. Rather than belabor the issue as it is of no real consequence here, the court will assume he is alleging retaliation for filing the EEOC complaint.

As an initial matter, the court notes that PSP did, indeed, fully investigate Plaintiff's claims, notwithstanding Plaintiff's election not to file a complaint with the Department. Based on Plaintiff's letter to Lt. Harrison and his meeting with Captain Henry of the Internal Affairs Division office, PSP chose to move forward with an investigation on its own accord due to the seriousness of his allegations. (*See* Doc. 44-15, Attachment 1, pp. 1-3.) Pursuant to that investigation, Lt. Winterbottom conducted approximately thirty interviews to ascertain whether Plaintiff's claims had merit (*see* Doc. 41-6, pp. 19-20) and compiled a 101-page investigative report on the matter (*see* Doc. 44-15). The court has carefully reviewed the report in its entirety and concludes that PSP conducted a comprehensive investigation into Plaintiff's complaints.[38] Plaintiff's disagreement with the outcome of the investigation does not void the fact that a thorough investigation took place.

As to Plaintiff's claim of retaliation, the court cannot find, and Plaintiff has not shown, any basis to conclude that the subsequent investigations, IAD 2009-0339 and 2010-0740, were materially adverse in that they would dissuade a reasonable employee from making or supporting a claim of discrimination. They were simply investigations; they did not change or alter Plaintiff's employment. Thus, Plaintiff again has failed to show an adverse employment action.

As to the final element in the prima facie case, Plaintiff claims there is sufficient evidence for a jury to find that IAD 2009-0339 and his resultant suspension would not have occurred but-for his complaint against Major Stein. (*See* Doc. 44, pp. 11, 18-19.) While it is technically true that the information which provided the basis

---

[38] In addition, the court finds it interesting that Plaintiff is complaining that PSP failed to fully investigate his claims when, at one point, he stated, "I don't want the Department to do an EEOC investigation on my behalf." (Doc. 44-15, p. 16.)

for Plaintiff's suspension came to light because of the investigation into his allegations against Major Stein and thus, had Plaintiff not reported Major Stein's comments, PSP likely would not have uncovered the information leading to IAD 2009-0339 and ultimately to Plaintiff's suspension, it appears that Plaintiff is grasping at straws. Indeed, Plaintiff's complaints formed the basis for the initial investigation that formed the basis for the subsequent investigations. But a technicality does not suffice to meet the but-for causation standard. Instead, Plaintiff must show that the "*desire* to retaliate was the but-for cause of the challenged employment action." *Nassar,* 133 S.Ct. at 2528 (emphasis added). He has not done so.

Assuming, *arguendo*, that Plaintiff established a prima facie case, PSP has put forth legitimate nonretaliatory reasons for the investigations that Plaintiff has not shown are pretextual. Upon reviewing IAD 2009-0190, Lt. Col. Jon Kurtz initiated IAD 2009-0339 against Plaintiff for several issues noted within the report, including Plaintiff repeating the sexual comments he attributed to Major Stein to his subordinates, admittedly making his own inappropriate comments within the workplace, and – most significantly – lying to an investigator during an official Internal Affairs Division investigation. (Doc. 41-6, p. 2 of 40.) Not only did PSP have a legitimate nonretaliatory reason for initiating the subsequent investigation, it was compelled to do so as these issues, if true, were in violation of PSP field regulations.

Likewise, PSP had a legitimate business reason for IAD 2010-0740. Despite Plaintiff's claims to the contrary (*see* Doc. 44, p. 19 of 25), there was evidence, albeit circumstantial, that Plaintiff and Yandrich had lied about their involvement during IAD 2009-0190. In their interviews with Lt. Winterbottom,

54

Plaintiff and Yandrich claimed that they were coworkers and friends, and did not speak on the phone or meet outside of the office. However, when confronted with their phone records, both Plaintiff and Yandrich admitted to speaking on the phone. This information, coupled with the significant amount of time the two were spending together at the office, provided ample reason for PSP to look into whether Plaintiff and Yandrich had lied about their relationship during IAD 2009-0190 in violation of PSP field regulations.

For all these reasons, Plaintiff has failed to establish a prima facie case of retaliation. At this stage of the proceedings, unsupported conclusions of retaliation do not warrant either expending additional judicial resources or presenting the issue to the jury. In short, the court has little trouble concluding that Plaintiff has failed to establish his prima facie case of retaliation.

### 3. Constructive Discharge Claim

In addition to bringing Title VII discrimination and retaliation claims, Plaintiff has brought a constructive discharge claim premised upon his eventual decision to resign from his employment five years short of full retirement. (*See* Doc. 44, pp. 16-17.) In particular, his complaint states that his involuntary resignation was the result of the discriminatory and retaliatory treatment he experienced at PSP. (Doc. 19, ¶¶, 60, 73, 89, 106, 124, 141, 162, 175.) While the court is fatigued from addressing Plaintiff's largely baseless claims in this case, the court will persist through the home stretch and engage Plaintiff's final arguments.

To establish constructive discharge, a plaintiff must show "that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon*

*Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984); *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001). In determining whether an employee was constructively discharged, the Third Circuit considers whether the employee "was threatened with discharge, encouraged to resign, demoted, subject to reduce pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010). In addition, "[t]here must be 'at least some relation between the occurrence of the discriminatory conduct and the employee's resignation.'" *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 359 (M.D. Pa. 2012) (quoting *McWilliams v. West Pa. Hosp.*, 717 F. Supp. 351, 355-56 (W.D.Pa. 1989)).

In the instant case, the record is absolutely devoid of any of these factors. First, in October 2008 – nearly three years prior to his retirement – Major Stein told Plaintiff, "we would hate to see you go." (*See* Doc. 44, p. 21 of 26.) Crediting Plaintiff's claims, for purposes of this motion, that the statement was a threat of discharge, there is no causation between the statement and Plaintiff's resignation as three years had passed between the two events. *See McWilliams*, 717 F.Supp. 355-56 (finding that the plaintiff could not show causation because the incidents complained of occurred three years prior to her resignation). Second, Plaintiff seems to suggest that the "undesirable" Farm Show detail was an alteration of his job responsibilities (*see* Doc. 44, p. 21 of 26); however, one temporary assignment, lasting only four days, is not an alteration in job responsibilities, especially considering his position made him eligible for the detail per the special order. As for the remaining factors, none are present here.

Moreover, Plaintiff's supervisors, *i.e.*, the two main antagonists according to Plaintiff, left the Bureau more than a year before Plaintiff retired (Stein Dep. at pp. 9, 56; Harrison Dep. at p. 6), and Plaintiff had two new supervisors who gave him outstanding performance reviews[39] (Burton Dep. at p. 103, Ex. 10). Furthermore, Burton's suspension was completed in January 2011, nearly six months prior to his retirement. For all these reasons, Plaintiff's constructive discharge claim fails.

### 4. Section 1983 Claims Against Lt. Winterbottom (Counts VII and VIII)

Lastly, Plaintiff alleges that he was retaliated against by Lt. Winterbottom for exercising his First Amendment right of freedom of association. As Plaintiff brings his claims pursuant to Section 1983, the court will briefly address the law as it pertains to that statute. Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law committed by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

---

[39] In his brief, Plaintiff alleges for the first time that Captain Aker, who replaced Major Stein, "wanted [ ] Plaintiff to leave and repeatedly encouraged him to leave; leaving would have meant a transfer to a less desirable position." (Doc. 44, p. 21 of 25.) Seeing as Plaintiff failed to make this accusation in his amended complaint – an accusation of which he surely would have had personal knowledge prior to filing his complaint, the court declines to address the merits of the argument as it is well-settled that courts need not consider additional claims that are raised for the first time in briefing. *See Aldinger v. Spectrum Control, Inc.*, 207 F. App'x 177, 180 n.1 (3d Cir. 2006).

> in an action at law, suit in equity, or other proper
> proceeding for redress.

*Id.* "Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)). To establish a claim under this section, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Plaintiff claims that Lt. Winterbottom violated his First Amendment right to freedom of association insofar as she conducted lengthy and frivolous investigations in retaliation for his talking to Yandrich.[40] In arguing this claim, Plaintiff asserts that "freedom of association is about the right of the entirety of public employees to commune with friends and associates without regard to race, nationality, gender, and the right to assert that freedom." (Doc. 44, p. 22 of 25.) While Plaintiff's interpretation of this First Amendment right is creative, the right to be friends a coworker is not protected by the First Amendment. Rather, the First Amendment guarantees two types of protected associations: "(1) associations founded on intimate human relationships which freedom of association is protected as a fundamental element of liberty, and (2) associations formed for the purpose of

---

[40] In the third to last sentence of his brief, Plaintiff asserts a claim for a violation of the equal protection clause of the Fourteenth Amendment. As Plaintiff failed to allege as much in his amended complaint, the court will not address the issue. *See Aldinger*, 207 F. App'x at 180 n.1.

engaging in activities protected by the First Amendment, such as the exercise of speech, assembly, and religion." *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3d Cir. 1998). Mere social relationships, such as those between friends and coworkers, is not protected under the First amendment. *Id.*

Furthermore, even if it was a protected form of association, Plaintiff could not show that his friendship with Yandrich was the impetus behind Lt. Winterbottom's alleged failure to properly investigate the inappropriate sexual comments by Major Stein or PSP's decision to conduct the subsequent investigations of Plaintiff. Rather, Plaintiff's relationship with Yandrich became a topic of interest during IAD 2009-0190 due to a question of credibility regarding their claims against Major Stein as they were the only two people – out of thirty interviewees – who reported they had heard Major Stein make such comments. Consequently, PSP suspected possible collusion and initiated the subsequent investigations into their credibility and relationship. Even Plaintiff himself conceded that the relationship of the witnesses reasonably had some bearing on the investigation. (Burton Dep. at p. 112.) For all these reasons, Plaintiff has failed to show that Lt. Winterbottom retaliated against him in violation of his First Amendment right to freedom of association and Lt. Winterbottom[41] is entitled to summary judgment on those claims.

---

[41] In addition, the doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Bergdoll v. City of York*, 515 F. App'x 165, 169 n.2 (3d Cir. 2013). Given that Lt. Winterbottom conducted the investigations in the course of her job duties and did not violate any of Plaintiff's statutory or constitutional rights, the protection of qualified immunity from Section 1983 claims would likely extend to Lt. Winterbottom.

**IV.**           **Conclusion**

        Overall, the circumstances of this case which the court has described in detail reflect a situation in which the employer should have been able to take the challenged employment actions without fear of being embroiled in an expensive lawsuit. Plaintiff cannot receive the protection of Title VII simply by claiming that he was discriminated or retaliated against without any factual basis for his claims. The facts of this case simply do not lend themselves for a reasonable factfinder to conclude that Plaintiff suffered any adverse employment action because of his race or making his complaints. Rather, the record shows that Plaintiff's inappropriate workplace conduct and subsequent acts of concealment was the basis for nearly every employment action taken by PSP.

        For the foregoing reasons, the court finds that there are no genuine issues of material fact as to Plaintiff's Title VII, PHRA, constructive discharge, and Section 1983 claims, and therefore will grant Defendants' motion for summary judgment it its entirety.

        An appropriate order will issue.


                        s/Sylvia H. Rambo
                        SYLVIA H. RAMBO
                        United States District Judge

Dated: January 2, 2014.